UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Torrey Laberge

    v.                                    Civil No. 18-cv-257-JL
                                        Opinion No. 2018 DNH 260
Nancy A. Berryhill, Acting
Commissioner, Social
Security Administration


**O R D E R**

    Torrey Laberge moves to reverse the decision of the Acting
Commissioner of the Social Security Administration ("SSA") to
deny his applications for Social Security disability insurance
benefits, or DIB, under Title II of the Social Security Act, 42
U.S.C. § 423, and for supplemental security income, or SSI,
under Title XVI, 42 U.S.C. § 1382.  The Acting Commissioner, in
turn, moves for an order affirming her decision.  For the
reasons that follow, the decision of the Acting Commissioner, as
announced by the Administrative Law Judge ("ALJ"), is affirmed.


## I. Standard of Review

    The applicable standard of review provides, in pertinent
part:

> The [district] court shall have power to enter, upon
> the pleadings and transcript of the record, a judgment
> affirming, modifying, or reversing the decision of the
> Commissioner of Social Security, with or without
> remanding the cause for a rehearing.  The findings of
> the Commissioner of Social Security as to any fact, if
> supported by substantial evidence, shall be conclusive
> . . ..

42 U.S.C. § 405(g) (setting out standard of review for decisions on claims for DIB); see also 42 U.S.C. § 1383(c)(3) (applying § 405(g) to SSI decisions).  However, the court "must uphold a denial of social security disability benefits unless 'the [Acting Commissioner] has committed a legal or factual error in evaluating a particular claim.'"  Manso-Pizarro v. Sec'y of HHS, 76 F.3d 15, 16 (1st Cir. 1996) (per curiam) (quoting Sullivan v. Hudson, 490 U.S. 877, 885 (1989)).

As for the standard of review that applies when an applicant claims that an ALJ made a factual error,

> [s]ubstantial-evidence review is more deferential than it might sound to the lay ear:  though certainly "more than a scintilla" of evidence is required to meet the benchmark, a preponderance of evidence is not.  Bath Iron Works Corp. v. U.S. Dep't of Labor, 336 F.3d 51, 56 (1st Cir. 2003) (internal quotation marks omitted).  Rather, "[a court] must uphold the [Acting Commissioner's] findings . . . if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [her] conclusion."  Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981) (per curiam).

Purdy v. Berryhill, 887 F.3d 7, 13 (1st Cir. 2018).

In addition, "'issues of credibility and the drawing of permissible inference from evidentiary facts are the prime responsibility of the [Acting Commissioner],' and 'the resolution of conflicts in the evidence and the determination of the ultimate question of disability is for her, not for the doctors or for the courts.'"  Id. (quoting Rodriguez, 647 F.2d

at 222).  Thus, the court "must uphold the [Acting Commissioner's] conclusion, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence."  Tsarelka v. Sec'y of HHS, 842 F.2d 529, 535 (1st Cir. 1988) (per curiam).

**II. Background**

The parties have submitted a Joint Statement of Material Facts.  That statement, document no. 9, is part of the court's record and is summarized here, not repeated in full.

Laberge stopped working full time on March 31, 2016, when he was laid off from his job as an x-ray inspector due to the closure of the factory where he had worked.  When he was laid off, he was 40 years old.

Claimant has received diagnoses of lumbosacral spondylosis without myelopathy,[1] cervical radiculopathy and myofascial pain syndrome,[2] bilateral carpal tunnel syndrome, C. difficile

---

[1] Spondylosis is "[a]nkylosis of the vertebra; often applied nonspecifically to any lesion of the spine of a degenerative nature."  Stedman's Medical Dictionary 1813 (28th ed. 2006). Ankylosis is "[s]tiffening or fixation of a joint as a result of a disease process, with fibrous or bony union across the joint; fusion."  Id. at 95.  Myelopathy is a "[d]isorder of the spinal cord."  Id. at 1270.

[2] Radiculopathy is a "[d]isorder of the spinal nerve roots." Stedman's, supra note 1, at 1622.  Myofascial means "[o]f or relating to the fascia surrounding and separating muscle tissue."  Id. at 1272.  Fascia is "[a] sheet of fibrous tissue

diarrhea, and celiac disease.  His treatment has included radiofrequency lesioning, medication (Tramadol, cyclobenzaprine, Nucynta, gabapentin, oxycodone, Zoloft, Klonopin, and Wellbutrin), trigger-point injections, medial branch block injections, physical therapy, wrist splints, and carpal tunnel release surgery.  Once, a physician prescribed compression stockings as treatment for varicose veins in claimant's lower legs, but he could not afford to purchase them.

In May of 2016, Laberge applied for DIB and SSI, claiming that he became disabled on May 1, 2014, as a result of carpel tunnel syndrome in both hands, back pain, a tilted pelvis, hip pain, and bursitis in his right shoulder and hip.  He later revised his alleged onset date to March 31, 2016, which is the day he was laid off from his job as an x-ray inspector.

In September of 2016, Dr. Phyllis Sandell, a non-examining state-agency consultant, reviewed Laberge's medical records, and based upon that review, she assessed his physical residual functional capacity ("RFC").[3]  According to Dr. Sandell, Laberge

---

that . . . encloses muscles and groups of muscles and separates their several layers and groups."  Id. at 700.

[3] "[R]residual functional capacity 'is the most [a claimant] can still do despite [his or her] limitations.'"  Purdy, 887 F.3d at 10 n.2 (quoting 20 C.F.R. § 416.945(a)(1), a regulation governing claims for SSI that is worded identically to 20 C.F.R. § 404.1545(a), which governs claims for DIB) (brackets in the original).

could lift and/or carry 25 pounds frequently and 50 pounds occasionally, push and/or pull the same amount of weight he could lift and/or carry, stand and/or walk (with normal breaks) for a total of about six hours in an eight-hour workday, and sit (with normal breaks) for a total of about six hours in an eight-hour workday.  She further opined that Laberge needed to alternate between sitting and standing for five minutes each hour to relieve pain and discomfort.  With respect to postural activities, Dr. Sandell opined that Laberge had an unlimited capacity for stooping and kneeling; could frequently balance; but could only occasionally climb ramps/stairs, climb ladders/ropes/scaffolds, crouch, and crawl.  With respect to manipulative activities, Dr. Sandell opined that Laberge had an unlimited capacity for reaching, fingering, and feeling, but had a limited capacity for handling, with both hands, which she described as a capacity for only occasional grasping and twisting, due to mild carpal tunnel syndrome.  Finally, Dr. Sandell opined that Laberge had no visual, communicative, or environmental limitations.

In June of 2017, Christopher Laurent, an advanced practice registered nurse ("APRN") who had treated Laberge, completed a Physical Impairment Medical Source Statement in which he offered opinions on Laberge's physical RFC.  Mr. Laurent did not have a supervising physician, but his Medical Source Statement was co-

signed by Dr. John Ford.[4]  While Dr. Ford neither treated Laberge nor supervised Mr. Laurent, Mr. Laurent reported that he had discussed Laberge's condition and his opinions with Dr. Ford.

Mr. Laurent indicated that he had been treating Laberge for four years, and he identified diagnoses of osteoarthritis in both hips, chronic ankle pain, disc disease,[5] and celiac disease. Mr. Laurent does not appear to have listed carpal tunnel syndrome as a diagnosis on his Medical Source Statement, although such a diagnosis does appear in some, but far from all, of Mr. Laurent's progress notes.

As for Laberge's physical RFC, Mr. Laurent opined that Laberge would constantly experience pain or other symptoms severe enough to interfere with the attention and concentration needed to perform even simple work tasks, but also opined that Laberge was capable of performing low stress jobs.  He further opined that Laberge could:  (1) walk one block without rest or severe pain; (2) sit for 20 minutes at one time before needing to get up; (3) stand for 20 minutes at one time before needing to sit down; (4) sit for less than two hours total in an eight-

_____

[4] On the Medical Source Statement, the name of Mr. Laurent's co-signer is difficult to decipher.  In his motion to reverse, claimant the co-signer as "Dr. Foes," but in their Joint Statement, the parties refer to "Dr. Ford."  The court adopts that spelling.

[5] Mr. Laurent applied an adjective to the term "disc disease," but it is indecipherable.  See Tr. 528.

hour workday; and (5) stand/walk for less than two hours total in an eight-hour workday.  He further opined that Laberge:  (1) needed to walk around for 10 minutes every 30 minutes: (2) needed a job that permits shifting positions at will from sitting, standing, or walking; and (3) needed a job that permits unscheduled 20-minute breaks every one to two hours.  In addition, Mr. Laurent opined that Laberge could occasionally lift and carry less than 10 pounds, could rarely lift 10 pounds, and could never lift 20 pounds or more.  With respect to postural activities, Mr. Laurent opined that Laberge could occasionally look down, turn his head, look up, hold his head in a static position, twist, stoop, and crouch, but could only occasionally climb ladders or stairs.  However, Mr. Laurent opined that Laberge had no limitations on his abilities for reaching, handling, or fingering.  Finally, Mr. Laurent opined that on average, Laberge was likely to be absent from work more than four days per month as a result of his impairments or treatment for them.

The SSA denied Laberge's applications for DIB and SSA. Thereafter, he received a hearing before an ALJ.  At the hearing, the ALJ took testimony from a vocational expert ("VE"), and posed several hypothetical questions to her.  In the first one, the ALJ asked the VE

> to assume an individual of the same age, education and
> work background as the claimant who is capable of the
> medium exertion level with the ability to lift and
> carry up to 50 pounds occasionally, 25 pounds
> frequently, who can stand and walk up to six hours per
> day and sit up to six hours per day but must alternate
> between sitting and standing for five minutes per hour
> as needed to relieve pain, who can frequently balance,
> occasionally climb, occasionally crouch, crawl and
> occasionally grasp and twist bilaterally with the
> upper extremities.

Administrative Transcript (hereinafter "Tr.") 68. The VE
testified that a person with those limitations could not perform
claimant's past work as a bartender, bench inspector,
construction worker, welder, or utility worker, but could
perform the medium-duty jobs of industrial cleaner and kitchen
helper and could also perform the light-duty jobs of furniture-
rental clerk, storage-facility rental clerk, and recreation-
facility attendant. The ALJ followed up with several additional
hypothetical questions, none of which are relevant to this
appeal. The VE also testified that the customary tolerance for
absenteeism is "no more than one absence per month." Tr. 72.

After Laberge's hearing, the ALJ issued a decision. In it,
she found that Laberge had three severe impairments: lumbar
spondylosis, osteoarthritis of the ankles and hips, and carpal
tunnel syndrome. The ALJ further found that none of claimant's
impairments, alone or in combination, met or medically equaled
the severity of any impairment on the SSA's list of impairments

that are per se disabling.  Then, the ALJ assessed Laberge's
physical RFC this way:

> [T]he claimant has the residual functional capacity to
> perform medium work as defined in 20 CFR 404.1567(c)
> and 416.967(c) except that he requires the opportunity
> to alternate sitting and standing for five minutes per
> hour as needed to relieve pain.  He can frequently
> balance, occasionally climb ramps/stairs/ladders/
> ropes/scaffolds, occasionally crouch, and occasionally
> crawl.  He can occasionally grasp and twist with the
> upper extremities.

Tr. 20.  In reliance upon the VE's testimony, the ALJ determined
that Laberge could not perform his past work, but retained the
RFC to perform the jobs of industrial cleaner, kitchen helper,
furniture-rental clerk, storage-facility rental clerk, and
recreational-facility attendant.  Consequently, she found that
Laberge was not under a disability from March 31, 2016, through
the date of her decision, which was August 24, 2017.

## III. Discussion

### A. The Legal Framework

To be eligible for DIB, a person must: (1) be insured for
that benefit; (2) not have reached retirement age; (3) have
filed an application; and (4) be under a disability.  42 U.S.C.
§ 423(a)(1)(A)-(D).  To be eligible for SSI, a person must be
aged, blind, or disabled, and must meet certain requirements
pertaining to income and assets.  42 U.S.C. § 1382(a).  The only
question in this case is whether the ALJ correctly determined

that Laberge was not under a disability from March 31, 2016, through August 24, 2017.

To decide whether a claimant is disabled for the purpose of determining eligibility for either DIB or SSI, an ALJ is required to employ a five-step sequential evaluation process. See 20 C.F.R. §§ 404.1520 (DIB) & 416.920 (SSI).

> The steps are:  1) if the [claimant] is engaged in substantial gainful work activity, the application is denied; 2) if the [claimant] does not have, or has not had within the relevant time period, a severe impairment or combination of impairments, the application is denied; 3) if the impairment meets the conditions for one of the "listed" impairments in the Social Security regulations, then the application is granted; 4) if the [claimant's] "residual functional capacity" is such that he or she can still perform past relevant work, then the application is denied; 5) if the [claimant], given his or her residual functional capacity, education, work experience, and age, is unable to do any other work, the application is granted.

Purdy, 887 F.3d at 10 (quoting Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001); citing 20 C.F.R. § 416.920).

At the first four steps in the sequential evaluation process, the claimant bears both the burden of production and the burden of proof.  See Purdy, 887 F.3d at 9 (citing Freeman v. Barnhart, 274 F.3d 606, 608 (1st Cir. 2001)); see also Bowen v. Yuckert, 482 U.S. 137, 146 (1987).  He must prove he is disabled by a preponderance of the evidence.  See Mandziej v.

[Chater](), 944 F. Supp. 121, 129 (D.N.H. 1996) (citing [Paone v. Schweiker](), 530 F. Supp. 808, 810-11 (D. Mass. 1982)).[6]  Finally,

> [i]n assessing a disability claim, the [Acting Commissioner] considers objective and subjective factors, including: (1) objective medical facts; (2) [claimant]'s subjective claims of pain and disability as supported by the testimony of the claimant or other witness; and (3) the [claimant]'s educational background, age, and work experience.

[Mandziej](), 944 F. Supp. at 129 (citing [Avery v. Sec'y of HHS](), 797 F.2d 19, 23 (1st Cir. 1986); [Goodermote v. Sec'y of HHS](), 690 F.2d 5, 6 (1st Cir. 1982)).

B.  Laberge's Claims

Laberge claims that the ALJ erroneously determined his RFC by improperly:  (1) weighing the medical-opinion evidence; and (2) evaluating his statements about his symptoms.  Neither claim has merit.

1.  Medical Opinions

In the decision that resulted from Laberge's applications for DIB and SSI, the ALJ gave great weight to Dr. Sandell's opinions and little weight to Mr. Laurent's opinions.  That, according to claimant, was a reversible error.  The court begins

---

[6] At step five, the burden of proof shifts to the Acting Commissioner, see [Seavey](), 276 F.3d at 5 (citing [Arocho v. Sec'y of HHS](), 670 F.2d 374, 375 (1st Cir. 1982)), but the Acting Commissioner's step-five determination is not at issue here, so there is no need to describe the mechanics of step five.

with the relevant legal principles and then turns to the ALJ's evaluations of the opinions at issue.

a. Legal Principles

For applications filed before March 27, 2017, the applicable regulations outline a hierarchy that, generally speaking, gives the greatest weight to medical opinions from treating sources,[7] gives less weight to medical opinions from sources who have examined but not treated a claimant, and gives the least weight of all to medical opinions from sources who have neither treated nor examined a claimant.  See 20 C.F.R. §§ 404.1527(c)(1)-(2) & 416.927(c)(1)-(2).[8]  "Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairments . . . ."  20 C.F.R. §§ 404.1527(a)(1) & 416.927(a)(1) (emphasis added).  Under the regulations in force when the ALJ issued her decision in this case, the category "acceptable medical source" included physicians, see 20 C.F.R. §§ 404.1513(a)(1) (2016) & 416.913(a)(1) (2016), but excluded

_____

[7] Under certain circumstances, the opinion of a treating source may be entitled to controlling weight, see 20 C.F.R. §§ 404.1527(c)(2) & 416.927(c)(2), but the question of controlling weight does not arise in this case because the record includes no opinion from an acceptable medical source who has treated Laberge.

[8] For claims filed on or after March 27, 2017, different regulations apply.  See 20 C.F.R. §§ 404.1520c & 416.920c.

APRNs, see 20 C.F.R. §§ 404.1513(d)(1) (2016) & 416.913(d)(1) (2016).[9]  Finally, "[t]he fact that a medical opinion is from an 'acceptable medical source' is a factor that may justify giving that opinion greater weight than an opinion from a medical source who is not an 'acceptable medical source.'"  Social Security Ruling ("SSR") 06-03p, 2006 WL 2329939, at *5 (S.S.A. Aug. 9, 2006).

To determine the amount of weight to give either an opinion from an acceptable medical source or an opinion from a medical source who is not an acceptable medical source, see 20 C.F.R. §§ 404.1527(f) & 416.927(f), a decisionmaker should consider the following factors:  (1) the length of the treatment relationship and the frequency of examination; (2) the nature and the extent of the treatment relationship; (3) the extent to which the source identifies medical signs and laboratory findings that support his or her opinion; (4) the opinion's consistency with the record as a whole; (5) the source's areas of specialization; and (6) other factors, including the source's familiarity with the SSA's disability programs.  See 20 C.F.R. §§ 404.1527(c)(2)-(6) & 416.927(c)(2)-(6).

---

[9] For claims filed on or after March 27, 2017, an APRN does qualify as an acceptable medical sources when rendering an opinion on an "impairment[] within his or her licensed scope of practice."  20 C.F.R. §§ 404.1502(a)(7) & 416.902(a)(7).

b.  Mr. Laurent's Opinions

     The ALJ gave "little weight" to Mr. Laurent's opinions and

focused, in particular, on his opinion that Laberge's experience

of pain would constantly interfere with the attention and

concentration necessary to perform even simple work tasks.[10]  The

ALJ gave Mr. Laurent's opinions little weight because:  (1) his

treatment notes do not support them; and (2) he is not an

acceptable medical source.  Laberge claims that the ALJ erred in

because:  (1) there was no necessary inconsistency between Mr.

Laurent's treatment notes and his opinions; and (2) Mr.

Laurent's statement that Dr. Ford agreed with his findings

"implie[d] that Dr. [Ford] had the opportunity to review the

treatment records of Mr. Laurent and others in their practice

before indicating his agreement with Mr. Laurent's opinion,"

Cl.'s Mem. of Law (doc. no. 8-1) 7.

     It is undisputed that Mr. Laurent is not an acceptable

medical source, and that is a factor that justifies giving his

opinions less weight than those of Dr. Sandell, who is an

acceptable medical source.  See SSR 06-03p, 2006 WL 2329939, at

*5.  Claimant attempts to overcome Mr. Laurent's status as a

_____

     [10] While the VE testified that another of Mr. Laurent's
limitations, i.e., more than four absences from work each month,
would preclude any employment, there does not appear to be any
testimony from the VE concerning the degree to which Mr.
Laurent's limitation on attention and concentration might affect
a person's employability.

non-acceptable medical source by pointing to Mr. Laurent's statement that he had discussed claimant's case with Dr. Ford, which, in claimant's view, implies that Dr. Ford had reviewed his treatment records.

However, even if the court were to assume, as claimant suggests, that Dr. Ford had reviewed his treatment records before co-signing Mr. Laurent's Medical Source Statement, claimant does not say how that would increase the amount of weight the ALJ should have given the opinions expressed that statement. Because claimant does not assert that Dr. Ford ever treated him, this is not a situation, such as that in Nichols v. U.S. Social Security Administration, Acting Commissioner, where the opinion of a licensed mental-health clinician, a non-acceptable medical source, was entitled to deference under the so-called treating-source rule because it had been co-signed by an acceptable medical source who had also treated the claimant, see No. 16-cv-443-PB, 2018 WL 1307645, at *10, n.9 (D.N.H. Mar. 13, 2018). Rather, this case is more akin to Coppola v. Colvin, No. 12-cv-492-JL, 2014 WL 677138 (D.N.H. Feb. 21, 2014). In that case, the signature of an acceptable medical source did not transform the opinion of a non-acceptable medical source, a licensed mental-health counselor, into the opinion of a treating source where there was no evidence that the co-signing doctor, who was an acceptable medical source, had ever treated the

claimant or even examined him.  See id. at *9.[11]  In short, there
is nothing about Dr. Ford's signature on Mr. Laurent's Medical
Source Statement that calls into question the ALJ's decision to
discount Mr. Laurent's opinions on grounds that he is not an
acceptable medical source.  Accordingly, the court turns to the
ALJ's second reason for discounting Mr. Laurent's opinions.

    In support of her finding that Mr. Laurent's clinical
records did not support the limitations in his opinion, the ALJ
wrote:

> For instance, while he alleged that the claimant
> "constantly" has symptoms that interfere with the
> attention and concentration needed to perform even
> simple work tasks, his clinic notes from November 2016
> indicate that the claimant's medication kept "all of
> his chronic pain issues at bay."

Tr. 22.  She further observed that "in March of 2017, [Mr.
Laurent] noted that the claimant admitted to an ability to work
while taking medication and he documented the claimant's report
that his pain was only at 3/10 with this treatment."  Id.  In
response, claimant quotes from the two treatment notes cited by
the ALJ and argues:

---

[11] See also Allen v. Colvin, C.A. No. 13-781L, 2015 WL
906000, at *11 (D.R.I. Mar. 3, 2015) ("It is well-settled that
neither the physician's sign-off on each encounter that the
patient had with the physician's assistant nor the physician's
sign-off on the physician assistant's opinion morphs the
assistant into an acceptable medical source.") (citing Lobov v.
Colvin, Civ. No. 12-40168-TSH, 2014 WL 3386567, at *14 n.8 (D.
Mass. June 23, 2014); Payne v. Astrue, No. 3:10-cv-1565 (JCH),
2011 WL 2471288, at *4-5 (D. Conn. June 21, 2011)).

The ALJ's findings regarding inconsistency between Mr.
Laurent's opinion and his November 2016 and March 2017
treatment notes are erroneous.  There is no <u>necessary
inconsistency</u> between Mr. Laurent's indication that
Nucynta pain medication "seem[ed] to keep his chronic
pain issues at bay" and his opinion that pain would
nonetheless constantly interfere with Mr. Laberge's
ability to sustain attention and concentration to
[perform] simple work-related tasks.  There is also no
<u>necessary inconsistency</u> between Mr. Laurent's opinion
regarding limitations caused by chronic pain and his
indication in March of 2017 that Mr. Laberge was "able
to work a little bit more" with oxycodone medication
and that although his pain level was "about a 3/10"
with the medication, he was unable to get out of bed
due to pain without the medication.

Cl.'s Mem. of Law (doc. no. 8-1) 6-7 (emphasis added).

Laberge's claim misses the mark.  Assuming, favorably to

claimant, that there is no necessary inconsistency between Mr.

Laurent's opinion and his treatment notes, that is not the

standard.  "[T]he resolution of conflicts in the evidence . . .

is for [the ALJ], not for . . . the courts," Purdy, 887 F.3d at

13, and for that reason, the court "must uphold the [ALJ's]

conclusion, even if the record arguably could justify a

different conclusion, so long as it is supported by substantial

evidence," Tsarelka, 842 F.2d at 535.  Thus, even if Mr.

Laurent's opinion is not necessarily inconsistent with his

treatment records, that provides no basis for reversing the

ALJ's decision.  Rather, the ALJ's decision is subject to

reversal only if no reasonable mind could accept her conclusion

that Mr. Laurent's opinions were inconsistent with his treatment

records.  Claimant does not make such an argument, and the court

concludes that a reasonable mind could accept the proposition

that an opinion that claimant suffered from disabling pain is

inconsistent with treatment notes reporting that medication kept

claimant's pain "at bay," and kept it to a level of three on a

ten-point scale.  In other words, the ALJ's finding that Mr.

Laurent's opinions were not supported by his treatment notes is

itself supported by substantial evidence.

Because substantial evidence supports the ALJ's

determination that Mr. Laurent's opinions were not supported by,

or were inconsistent with, his treatment records, and because

the ALJ permissibly relied upon Mr. Laurent's status as a non-

acceptable medical source, her evaluation of Mr. Laurent's

opinions gives the court no cause to reverse her decision.

### c.  Dr. Sandell's Opinions

The ALJ gave Dr. Sandell's September 2016 opinions great

weight, and based her RFC assessment on them.  When evaluating

those opinions, the ALJ explained that Dr. Sandell had "reviewed

the medical evidence [on] file and . . .  nothing received at

[Laberge's] hearing support[ed] a worsening in the claimant's

condition since that date," Tr. 22.  Laberge claims that:  (1)

the ALJ committed reversible error by failing to provide "any

specific discussion of the evidence received between the date of

Dr. Sandell's review and the hearing," Cl.'s Mem. of Law (doc.

no. 8-1) 6; and (2) "August 2016 and September 2016 treatment
notes not reviewed by Dr. Sandell document increasing symptoms
of bilateral numbness and difficulty grasping objects due to
carpel tunnel syndrome, and [he underwent] a subsequent right
carpel tunnel release procedure in December of 2016," id.  The
medical records relating to claimant's carpel tunnel syndrome
that post-date Dr. Sandall's opinions provide no basis for
reversing the ALJ's decision.

        Claimant argues that medical developments post-dating Dr.
Sandell's opinions significantly eroded the amount of weight the
ALJ should have given those opinions.  These are the applicable
principles:

>        [A]n opinion of a reviewing consultant does not
>        provide substantial evidence to support an ALJ's
>        findings if it is based on a "significantly incomplete
>        record."  Alcantara v. Astrue, 257 Fed. Appx. 333, 334
>        (1st Cir. 2007); Padilla v. Barnhart, 186 Fed. Appx.
>        19, 21 (1st Cir. 2006); Avery v. Acting Comm'r, Social
>        Security Admin., [No. 17-cv-443-JD,] 2018 WL 2376507,
>        at *4 (D.N.H. May 24, 2018).  A record is not
>        significantly incomplete as long as the new or later
>        evidence does not support greater limitations or is
>        arguably consistent with the earlier assessment by the
>        consultant.  Giandomenico v. Acting Comm'r, Social
>        Security Admin., [No. 16-cv-506-PB,] 2017 WL 5484657,
>        at *4 (D.N.H. Nov. 15, 2017).  "The ALJ bears the
>        burden of determining and explaining whether missing
>        evidence is material to assessing the claimant's
>        limitations."  Avery, 2018 WL 2376507, at *4.

Scott v. Berryhill, No. 18-cv-26-JD, 2018 WL 4328873, at *2
(D.N.H. Sept. 11, 2018).

For ALJ to carry her burden of showing that evidence post-dating a state-agency consultant's opinion does not support greater limitations than those in the opinion, or is arguably consistent with the opinion, she cannot merely say that the record has undergone no material change without explaining her analysis. See Alcantara, 257 F. App'x at 334. While claimant faults the ALJ for making that error, it is claimant who is mistaken. Rather than making a conclusory statement that the record had not changed since Dr. Sandell gave her opinion, the ALJ: (1) noted claimant's December 2016 carpal tunnel release surgery; (2) cited his surgeon's operative note; and (3) pointed out the lack of any "records of follow-up treatment after this procedure," Tr. 18. Thus, the ALJ did not make the error that Alcantara warns against and, in fact, she expressly cited some of the evidence that claimant accuses her of failing to discuss.

Moreover, additions to the record after Dr. Sandell's opinion would seem, if anything, to support lesser rather than greater limitations than the limitation to occasional grasping and twisting that Dr. Sandell posited. For example, in the December 2017 Medical Source Statement by Mr. Laurent, on which claimant relies, Mr. Laurent opined that Laberge had no significant limitations on reaching, handling, or fingering. That would suggest an improvement in claimant's carpal tunnel

syndrome since the date on which Dr. Sandell limited her to occasional grasping and twisting.

In any event, because the ALJ committed no error in determining that the record post-dating Dr. Sandell's opinion did not support limitations greater than those she had identified, the ALJ did not err by giving great weight to Dr. Sandell's opinions.

2.  Claimant's Statements about his Symptoms

In her decision, the ALJ discounted "claimant's statements concerning the intensity, persistence and limiting effects of [his] symptoms," Tr. 21, explaining that those statements were "not entirely consistent with the medical evidence and other evidence in the record," id.  According to claimant, the ALJ erred by:  (1) relying primarily upon a lack of objective medical evidence to discount his statements; (2) determining that his treatment records did not support his statements, when his statements were not necessarily inconsistent with his treatment records; and (3) relying upon his non-compliance with treatment without considering the reasons for his non-compliance.[12]  The court begins by outlining the applicable legal principles and then turns to Laberge's claims of error.

---

[12] Laberge also claims that "[t]he ALJ's decision erroneously states that 'no treating physician described the claimant as presenting with signs of severe pain,' despite Mr. Laurent's records to the contrary."  Cl.'s Mem. of Law (doc. no.

a.  <u>Legal Principles</u>

In 2016, the SSA promulgated SSR 16-3p, which is titled
"Evaluation of Symptoms in Disability Claims."  SSR 16-3p was
issued to "provide[] guidance about how [the SSA] evaluate[s]
statements regarding the intensity, persistence, and limiting
effects of symptoms in disability claims under Titles II and XVI
of the Social Security Act."  2016 WL 1119029, at *1 (S.S.A.
Mar. 16, 2016).

SSR 16-3p outlines a two-step evaluation process in which a
decisionmaker first determines whether a claimant has a
medically determinable impairment that could reasonably be
expected to produce his alleged symptoms.  If a claimant has
such an impairment, the decisionmaker must evaluate the
intensity and persistence of those symptoms, and then determine
the extent to which they limit the claimant's ability to perform
work-related activities.  In making that evaluation, a
decisionmaker should

> examine the entire case record, including the
> objective medical evidence; an individual's statements
> about the intensity, persistence, and limiting effects
> of symptoms; statements and other information provided
> by medical sources and other persons; and any other
> relevant evidence in the individual's case record.

---

8-1) 10.  But Mr. Laurent is an APRN, not a physician, so this
claim of error is, itself, erroneous.

SSR 16-3p, 2016 WL 1119029, at *4.  However, an "ALJ cannot reject the veracity of the claimant's own statements . . . based solely on the conclusion that they are unsubstantiated by the objective medical evidence."  Tellier v. U.S. Soc. Sec. Admin., Acting Comm'r, No. 17-cv-184-PB, 2018 WL 3370630, at *6 (D.N.H. July 10, 2018) (citing 20 C.F.R. § 404.1529(c)(2); Clavette v. Astrue, No. 10-cv-580-JL, 2012 WL 472757, at *9 (D.N.H. Feb. 7, 2012); Valiquette v. Astrue, 498 F. Supp. 2d 424, 433 (D. Mass. 2007); see also SSR 16-3p, 2016 WL 1119029, at *4.  Finally, when evaluating the intensity and persistence of a claimant's symptoms, the ALJ should consider the so-called Avery factors:

> (i) the claimant's daily activities; (ii) the location, duration, frequency, and intensity of the pain or symptom; (iii) any precipitating and aggravating factors; (iv) the effectiveness of any medication currently or previously taken; (v) the effectiveness of non-medicinal treatment; (vi) any other self-directed measures used to relieve pain; and (vii) any other factors concerning functional limitations or restrictions.  20 C.F.R. 404.1529(c)(3); Childers v. Colvin, [No. 14-cv-270-JL, 2015 WL 4415129], [at] *5 [(D.N.H. July 17, 2015)] (citing Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 29 (1st Cir. 1986)).

Tellier, 2018 WL 3370630, at *7.  However, "'an ALJ need not address every Avery factor' in [her] written decision for [her] evaluation to be supported by substantial evidence."  Id. (quoting Ault v. Astrue, No. 10-cv-553-JL, 2012 WL 72291, at *5 (D.N.H. Jan. 10, 2012)).

b.  Underline Lack of Objective Medical Evidence

Laberge faults the ALJ for relying upon the lack of substantiating objective medical evidence "as the primary basis for her evaluation of [his] testimony."  Cl.'s Mem. of Law (doc. no. 8-1) 10 (emphasis added).  That is probably a fair characterization of the ALJ's decision, but while SSR 16-3p bars an ALJ from relying "solely on objective medical evidence" to reject a claimant's statements about his symptoms, 2016 WL 1119029, at *4 (emphasis added), it goes no further, and plainly does not specify the degree to which an ALJ must rely upon factors other than objective medical evidence when rejecting a claimant's statements.  Because the ALJ in this case did rely upon other factors, including claimant's self-reports to his physicians, his course of treatment, and his compliance with treatment, the ALJ's consideration of the objective medical evidence – a factor she was expressly directed to consider by SSR 16-3p – provides no basis for reversing her decision.

c.  Underline Consideration of the Medical Evidence

Laberge next claims that the ALJ erroneously interpreted the medical evidence when she wrote:

> With respect to the claimant's allegation of pain after five minutes of standing or 15 minutes of walking, this is not supported by the objective findings or course of treatment documented in the medical record.  In fact, in April 2016, Dr. Wiley observed that his examination was "really quite unremarkable."  Further, in August 2016, Nurse

> Practitioner Laurent documented the claimant's self-
> report that his medication was effective in treating
> his pain complaints.  Nurse Practitioner Laurent wrote
> that the medication "seems to keep all of his chronic
> pain issues at bay."  Nurse Practitioner Laurent also
> repeatedly observed that the claimant maintained
> "good" or normal gait and station.

Tr. 21-22 (citations to the record omitted).  Claimant objects
to the foregoing analysis by:  (1) pointing to other parts of
Dr. Wiley's office note; and (2) arguing that neither effective
relief from pain medication nor normal gait and station are
necessarily inconsistent with his statements about his symptoms.
Laberge's claims amount to nothing more than an invitation to
reweigh the evidence already weighed by the ALJ, an undertaking
that is beyond the scope of a proper review of an ALJ's
decision.  See Purdy, 887 F.3d at 13; Tsarelka, 842 F.2d at 535.
Accordingly, the second part of Laberge's claim that the ALJ
erroneously evaluated his statements about his symptoms is
unavailing.

### d.  Non-Compliance with Treatment

Finally, Laberge claims that the ALJ erred by discounting
his statements about his symptoms on grounds that he has not
used compression stockings.  On this point, SSR 16-3p explains
that "if [a claimant] fails to follow prescribed treatment that
might improve symptoms, [the SSA] may find the alleged intensity
and persistence of [her] symptoms are inconsistent with the
overall evidence of record," 2016 WL 1119029, at *8.  But, the

SSA "will not find [a claimant's] symptoms inconsistent with the evidence in the record on this basis without considering the possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints." Id.

Laberge argues that the ALJ failed to properly consider, or credit, his reason for not using the compression stockings that his doctor had recommended, i.e., the fact that he could not afford them. The ALJ probably erred by failing to mention claimant's financial inability purchase compression stockings. See SSR 16-3p, 2016 WL 1119029, at *8. But because the ALJ's decision to discount claimant's statements can be affirmed even without her comment about the compression stockings,[13] a remand based upon that presumed error would be the definition of an empty exercise, and when "remand would be an empty exercise, it is not warranted," Benoit v. Berryhill, No. 18-cv-61-SM, 2018 WL 6304353, at *6 (D.N.H. Dec. 3, 2018) (citing Newman v. Berryhill, No. 17-cv-455-LM, 2018 WL 2215513, at *4 (D.N.H. May 15, 2018); Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 656 (1st Cir. 2000)).

---

[13] The ALJ's observation about compression stockings appears to be surplusage, in that they were recommended as a treatment for varicose veins, a non-severe impairment that claimant does not appear to identify as the cause of pain or any other symptom that impairs his ability to work.

## IV. Conclusion

Because the ALJ has committed neither a legal nor a factual error in evaluating Laberge's claim, see Manso-Pizarro, 76 F.3d at 16, his motion for an order reversing the Acting Commissioner's decision[14] is denied, and the Acting Commissioner's motion for an order affirming her decision[15] is granted. The clerk of the court shall enter judgment in favor of the Acting Commissioner and close the case.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated:  December 28, 2018

cc:  D. Lance Tillinghast, Esq.
     Michael L. Henry, Esq.

_____

[14] Document no. 8

[15] Document no. 10